Thank you. If it may please the Court, Daniel Tabak from Cohen & Gresser on behalf of Eddystone Rail Company. The first narrow threshold question before this Court is whether removal is proper under the EDGE Act, even though, as the District Court correctly found, the relevant transactions occurred entirely within the United States. In AIG, this Court explained the EDGE Act jurisdiction requires international or foreign qualifying activity by a covered bank because the EDGE Act is designed to promote international or foreign activity by covered banks, not by foreign organized entities. Well, isn't the question then whether this is or is not considered international banking? That's exactly right. And there is not international banking when all the acts by the EDGE Act banks occurred entirely in the United States with counterfeits of whatever nationality also acting entirely in the United States. So what the bankers were suing are entities that were at the center, syndicates that had foreign participants. Well, so in one case, that's actually incorrect. The EDGE Act bank among the TPG dependents, PNC, was not at the center. It was not the administrative agent. In fact, it was not even on the same loan as the one foreign organized entity. In the Bank of America group, yes, there was a foreign organized participant acting entirely in the United States. And the record shows that the personnel were in New York, not overseas who were acting on this. You're not claiming your client didn't know that when it entered into these credit agreements with the Bank of America lenders group in 2019-2018 and TPG that it did not understand that as part of that conglomerate of banks providing credit, there were foreign banks. You're not claiming your client wasn't aware of that, are you? My client was not involved in those loans at all. My client was a counterparty of a subsidiary of the entities that was involved in those loans. So it's a separate sort of issue. Feral gas was involved in those loans. My client Edison had a contractual arrangement with BTS, which was a feral gas. How is this case different than Kirchner, where it seems to be the same kind of situation. Loans by foreign banks, which are paid. All the transactions took place in the United States, but it involved federal banks. And that was enough for... Kirchner is very different, because in Kirchner, the EJAC bank directly assigned a portion of its loan to a foreign entity. Now, Kirchner doesn't specifically say what foreign means in that context, but if you look at the briefs, it's very clear. The defendants in that case, which included two of the defendants here, in a brief signed by counsel for some of the defendants here, said that international means a cross-border transaction involving domiciliaries in different countries. And they actually contrasted that, on page 27 of the brief, with domestic transactions involving U.S. banks. But I'm asking you not about the briefs, but about the case. This court's holding in 2023 in Kirchner, and a finding that the same claim was raised there, that these transactions occurred within the United States. But the court rejected that, saying that, you know, you enter into business with a foreign bank knowingly, and there's no claim that Feral Gas did know that it was entering into business with a foreign bank. Correct? There's two issues there. One was in the district court. The district court said sort of what they're saying and what the case is here. Bank of Montreal was involved and was acting entirely in the United States. Separately, what the defendants did not even argue in that case to this court, and this court did not rule on that Bank of Montreal issue, what they did rule on was the direct assignment of loans to foreign entities. It seems clear when you read the briefs, those foreign entities were acting offshore. So it's telling that the defendants in that case did not argue the Bank of Montreal issue. Aren't the entities there acting offshore because Bank of America is collecting the money from Feral Gas, right? The funds that you claim were fraudulently converted or transferred, that were assets of BTS. So Feral Gas pays off its credit, its loans, to Bank of America, and it's understood that they will administer the payments to a number of banks, some of them out of the country, some of them in the United States. Again, I'm struggling to understand how that is different from the Kirshner case, where you have maybe a direct assignment, but the point is Feral Gas understood it was doing business. It was getting loans and credit from a group of banks, albeit maybe the distribution of the payments would be through Bank of America, but it was a direct contract with Feral Gas, no? The leap that you're making that is not in the record here is that any activity occurred outside the United States. In fact, the district court, subject to clear error, said... When you say any activity, what are you talking about? I'm talking about any transfers of money, anybody signing any contracts, anything in relation to this credit agreement. According to the district court, subject to clear error analysis, all of that took place entirely in the United States. Suppose, just hypothetically, there's a bank in Paris, headquarters in Paris, has a corresponding bank in New York. The New York bank joins the syndicate, agrees to fund a certain portion of the loan, and the ordinary course of business, the loan is paid back. Is that the... The documentation is prepared in the States, the clothes in the States, the offices of the parties to the loan were in New York. Is that foreign banking or domestic banking? It may be foreign banking of the Paris bank, but it's not foreign banking of the EJAC bank. The EJAC bank acted entirely in the United States. So, it's not offshore banking, it's not international foreign activity by the EJAC bank. It is by the foreign bank, but not the EJAC bank. And what AIG clearly says is, you need to have international or foreign activity by the EJAC bank. But if he puts together the syndicate and collects foreign money? There's no evidence in the record of collecting foreign money. Hypothetically, if they collect money that comes from overseas directly? Yes, they could do that. The EJAC bank is putting together a syndicate. Part of the syndicate involves a foreign bank. The foreign bank sends funds to the EJAC. If it sends funds directly to the EJAC bank, that can be international or foreign activity by the EJAC bank. If it sends money to its U.S. branch, and the U.S. branch interacts with the EJAC bank, there's no foreign or international activity by the EJAC bank. And that's what AIG expressly requires. The EJAC bank must be the entity acting internationally or foreign. But that's not what the court found in Kirshner. And even in footnote 48, the court cites cases where there's just a term loan, a letter of credit sent from a foreign bank to a U.S. bank for a U.S. business. That was sufficient. Is it because Bank of America was distributing the money that it was getting? Was it because Bank of America is the funnel, you're saying, through which all the money comes in from the banks that are lending the money, and the money is then dispersed to the banks that are loaning it? And you're saying just because it flows through Bank of America, that that makes it… No. The issue isn't who Feral Gas contracts with. It's who Bank of America relates to and who it deals with. But I understand if Bank of America dealt with these foreign banks and Feral Gas had no way of knowing, but the deal with the loans with Feral Gas were direct with all the banks. It's just that Bank of America was administering it. Isn't that the facts here, or am I misreading the facts? Because I didn't understand this to be a contract between Feral Gas and Bank of America, and then Bank of America on its own decides to go to foreign banks. I thought this was a contract between Feral Gas, Bank of America, and Capital One, Fifth, Third Bank, JPMorgan Chase, Wells Fargo, the Bank of Tokyo, SunTrust Bank, BMO, Harris Bank, CIDC Bank of U.S., and U.S. Bank National. That all of these banks Feral Gas dealt with directly and got credit from them. Not that they let Bank of America pick who they wanted to have a line of credit with. Do you see what I'm saying? I see what you're saying. Am I misreading the facts? I think the question, though, under the adjunct, is not who Feral Gas contracts with. But that's not my question. Am I misreading the facts? Was this not a direct contract between Feral Bank and these banks? I believe it was a direct contract, but that's not relevant. Mr. Conjecture, can I maybe help you out here? Please. The issue has nothing to do with what Feral Gas knows about or doesn't know about. This is a jurisdictional question. It's not something that Feral Gas either did or didn't do something wrong or anything of the sort. It's just a question of, does this involve international banking by an edge bank? That's the question before us. Correct. And the edge bank in question for this part of the questioning has been Bank of America. Correct. And so the question that you are asserting is that Bank of America did not engage in international banking when it dealt with a New York affiliate or a U.S. affiliate of a foreign bank. That's the position that you're taking. Is that correct? That's essentially correct. Now let's get back to Kirshner. Kirshner seems on its face to take the position that when there, I guess it was JPMorgan Chase, was what looks to me as a non-banker, like something very similar to Bank of America in this case. They're aggregating, they're acting on behalf of a consortium. The way they did it may have been different, but I'm having trouble understanding why there is a difference between assigning a part of your loan to a foreign bank and just acting as an administrative agent for a foreign bank. But Kirshner seemed to be concerned with the fact that it was a foreign bank, not with which office of the foreign bank, the one in the Cayman Islands or the one in Paris or the one in Montreal or the one in New York. If it's a foreign bank that the EJAC bank is dealing with, it is international banking. That seemed to me what I was reading Kirshner to say, and you are trying to distinguish it on what ground. That issue was not actually in dispute in Kirshner that the foreign banks were acting outside the U.S. And that's why even the defense in that case said that in international transactions they cross-bordered transactions, because that's what they had there, international foreign banks acting outside the U.S. And let me again get back to it. It has always seemed to me that your answer with respect tends to beg the question, because you're saying that's just what international banking is. I'm not sure I find that so directly in our cases. They just talk about international or foreign banking. Is the point that you're making that what Bank of America did here did not need to be done by an edge bank? What Bank of America did here could have been done by any American bank, even one that's state-chartered. Is that your point? Not quite. I would say the point is this court has not defined international or foreign in the EDGE Act context. Exactly. And so we look at dictionary definitions, and international means involving different countries. It's cross-border. This court in AIG defined it as offshore. I'm not helped by the dictionary. I'm trying to ask you whether the place to look for help is to the EDGE Act and its purposes. Is that what you're really relying on to say the jurisdictional provisions that were added to the EDGE Act in the 1930s were designed to give federal jurisdiction in the kinds of transactions that EDGE Act nationally chartered banks were created to do, which they could not otherwise have done effectively? If you look, for example, at Section 611, those banks are designed to do international and foreign banking. And if you look at Section 616, it says they must act entirely outside the United States, except for some incidental activity that the Federal Reserve can say you can do in the United States. So what it's looking at there is it's very clearly making a geographic distinction. You must be acting outside the United States. This is puzzling to me because isn't the Bank of America N.A. that is the EDGE Act bank the same one I have a credit card from? There are two sets of EDGE Act banks. There are some that only can act overseas, offshore, and some that can act in the U.S. and offshore. So I think probably your credit card is from one of the latter. I'm just trying to understand. I read the part of the legislative history and everything about how, and I think it's in the statute as I read it, that EDGE Act banks can only operate except for incidental activities overseas. But if what you're saying happened here is not international banking, then why was Bank of America doing it at all? So Bank of America, I would assume, is chartered under Section 601, which allows for both domestic and online. But when it's offshore, there's a very clear geographic component under Section 616. It must be outside the United States. So if a district court's finding is subject to clear error review and there's nothing in the record disputing it, all of the relevant activities took place within the United States, then that, by definition, is not international or foreign activity. That's domestic activity. I hear exactly what your argument is. And what I'm focusing on is when you say by definition, whose definition is it? What are we looking for to determine what counts as international banking under the EDGE Act, not by what some jet-setter thinks is being international or whatever. In ordinary parlance, this is technical stuff. So there's no precedent that I'm aware of that defines it. So traditionally, what one would do is look at the definitions. The definition of international involves cross-border activity. That's what some of these defendants said in the Kirshner case. That's what we say. It has to be cross-border. There's clearly a geographic component under Section 616. There must be somebody overseas that the EDGE Act Bank is either dealing with or somebody from the EDGE Act Bank operating overseas. Under the definition, I don't understand why it's not foreign banking if the money going into the syndicate comes from overseas. There's no evidence in the record that any money came from overseas or went overseas. What will the foreign banks do? They have U.S. offices that have their own accounts. If the defendants wanted to say that that's not the case, that was their burden in the Notice of Removal. This is clear law. It's their burden in the Notice of Removal to say, some of this money came from overseas or some of this money went overseas. And under AIG, it has to be the EDGE Act Bank that is involved in that overseas transaction. It can't be the EDGE Act Bank. The EDGE Act Bank tells Bank Stendander that we need $100 million to close this deal next week. We'll see you at the closing. Get the money. Bank wires it, says, you know, we really need this money because this is 95% of the deal you're funding. Stendander wires the money to its local office. The local officer shows up at the closing with wire instructions or sort of good funds or whatever. Is that foreign banking? In that case, it would depend on whether the EDGE Act Bank was calling San San Dier New York office and speaking to somebody in the U.S. and saying, you know, you're on this loan. So if you call New York, it's not foreign banking, but if you call Madrid, it is? If you knew he was calling Madrid, yes. What? If he was dealing with somebody on this deal in Madrid, yes. It can't be just he calls New York and the cell phone picks up in Madrid. He said, I need $100 million. And the Madrid guy gives him another call, another phone number to call. The phone number happens to be in the States. That then makes it not foreign banking? In that case, it still is because the EDGE Act Bank is calling somebody in Madrid. They're dealing with somebody in Madrid. In this case, everybody they're dealing with, according to the record here, the subject of clear error, everybody was in the U.S. Well, you know, I'm having a lot of problems on following you on this because it just seems to me to be kind of inconsistent with the way the real world operates. I'm getting money from Sandan, and it's $100 million, and it's a deal that's going to close, you know, up the street on Park Avenue. They're calling back and forth between each other all the time. I'm checking spreads. I'm checking credits. I'm being sure I can, you know, get good funds for the closing and all the things you've got to do if you're going to close this deal. So you're telling me that if this exchange involves— this exchange does not involve foreign banking unless there are no calls. Maybe this would help answer. If the EJAC bank is dealing with U.S. personnel, it's on top of the air, in the United States, then it's not international. A senior vice president comes over to New York. And it's somebody from their Madrid office. Yeah, comes to New York and says, you know, I want to go to a show. I want to see you. You know, I want more business from you. That doesn't involve this particular arrangement, but that would also appear to be international or foreign banking by Santander, not by the EJAC bank. But if the EJAC bank here—I think the distinction is— The EJAC bank makes a deal in New York with the man who came from Madrid. That, I think, because they know he's from Madrid, that's not the issue here. That may be international banking. But here, the record is everybody they're dealing with is in New York. There's nobody coming from Madrid in the record. Okay, what is the general rule you are urging on us as a definition of foreign banking? So international banking would be cross-border. Foreign would be entirely overseas. But I think we're talking more of the international. What we said and what a couple of the defendants here said in particular is it has to be cross-border, and cross-border by the EJAC bank. So if everybody—and you don't need to go to the general rule in this case, because in this case, the district court correctly found, under a clear-earth standard, everything took place in the United States. You see, the problem is this is a jurisdictional statute, and you are creating a jurisdictional rule or advocating for a jurisdictional rule that is rather complicated and fact-specific. And we'd have to have an inquiry into this. I understand, and I actually am not saying that. The rule is it should be in the notice of removal. So if the notice of removal says the EJAC bank dealt with somebody overseas, then you'd have that. But in this case, the notice of removal says only we dealt with people who were affiliated with a foreign lender, and there's record evidence put in that those people were all entirely in the United States. Then you can just deal with it on the basis of— Are you certain, counsel, a more basic question? We're now assuming that you are correct, that there's nothing in the record to suggest that there weren't communications with banks overseas or across borders, to use your term. Are you certain about that? I'm not certain, but we're limited to the notice of removal. That's clear circuit law. It was up to the defendants. If they wanted to show international foreign banking, they had to put that in the notice of removal. You could look, for instance, footnotes 16AIG says— So if there's evidence in the record otherwise, we're limited in looking at whether the court committed clear error? We're limited only to look at the notice of removal and what was submitted in connection with it? Or can we look at other items in the record that the district court looked at? The circuit standard is limited to the notice of removal in support of removal. That's a clear standard in the circuit. But there's also nothing else in the record that says that there was any transfer overseas or anybody from any of these other banks, foreign organized banks, that was operating overseas. There's just nothing in the record on it. The only thing that the defendants tried to add to the record was transfers overseas, but they're not in the record at all. And if they took place, it's just as likely that they were transfers by the U.S. office to a foreign office. And that's not an action by the EJAC bank. So the record, there's absolutely nothing in the record showing that any money crossed the border here. So if the EJAC bank emailed the concordant minor, hypothetical, emailed the headquarters in Madrid to confirm that the New York office had the capacity and the authority and so forth to do this deal and that for efficiency, cost of funds, et cetera, et cetera, more efficient to do it in New York than to do it in Madrid, is that foreign bank? Is it international? Everything else took place in New York. I think that's a tougher question. I think it is still ultimately, it depends where in this transaction. I think, yes, if the EJAC bank is reaching out to a foreign entity overseas. Yeah, that's what money can send in Madrid. They've got funds they want to deploy. I do what I just outlined for you. Foreign bank? Yeah, I think that may be international banking. It's not in the record here, but if the EJAC bank reaches out overseas to a foreign lender, a foreign lender acting overseas and says, I want you to be part of this syndicate. You know what, I think where you lose it. Well, it turns off and says, look, we don't have expertise in New York banking regulations. We've got a banking office in New York. Let's deal with them. Here's the number to call. Have a good day. You know, that's actually where I think the tough question is, whether that's international banking, because ultimately the deal was not, if the deal ultimately became with the New York folks, you just have that slender read of a first call overseas. Arguably that's enough because the EJAC bank was trying to arrange it with the overseas lender. But at the end of the day, you only have. The definition of foreign banking just collides head-on with commercial realities. It doesn't seem to me to be workable. I may be missing something, but we set down rules of general application, and I just don't know how the rule you are proposing would function and could function in a real commercial world. I think the rule would ultimately function because defendants who wanted to remove under the EJAC would have to either show that there was some international or foreign activity, something happening overseas, or they wouldn't be able to remove. But that's what the case law is. It's got to be in the notice of removal. You can't just say it may have happened. And remember, all doubts are resolved against removability. So where there's nothing in the record showing anybody acting overseas, much less any interaction between the EJAC bank and anyone overseas, you can't go outside the notice of removal. You have to resolve all doubts against removal. Counsel. You can make a clear rule here. Thank you. Counsel, we understand that. Now, you're about 20 minutes over your allotted time, so we want to hear from your opponents, and we will give you the three minutes for rebuttal that you reserve. So I guess we're never going to get to talk with you about Admiralty jurisdiction. We're never going to get to talk to you about the merits. We could be here all day. Hopefully I can get some more rebuttal about the merits of Admiralty. I'll pass. Thank you. Thank you. Still good morning, and may it please the Court. Lyra Samus Buchwald of Davis Polk & Wardwell on behalf of Bank of America and the 10 other financial institutions that are part of the 2009 credit facility. I'm planning to address the jurisdictional issues, and if I have time I'll also get to the allegations against my clients. Mr. Ward is here to address the allegations against his clients. Now, first, with respect to the EDGE Act, I think the panel is absolutely correct that Kirshner is on all fours. There you have J.P. Morgan, which was serving as the EDGE Act bank, which syndicated a loan to 61 other banks, 61 other lenders. Fifty-nine of those were domestic. Two of those were foreign. And there the panel clearly concluded after hearing the argument that was being advocated for here, that it wasn't sufficiently foreign, that it wasn't enough of a connection, concluded that an EDGE Act bank's direct assignment of a loan to a foreign entity qualifies as international or foreign banking. That is what Kirshner said. And the notice of removal in Kirshner didn't include information about where employees were located or how many people were there or where funds were cleared. It was about domicile. The list of those entities and their domicile that was part of the notice of removal in Kirshner, that was what was affirmed by this court last August. Now, in terms of why that's on all fours, the analogy is Bank of America is serving as the agent here in our loan. It then has, in the credit agreement, and just on to your point, they're all part of the same credit agreement. And at the time in 2009, there were a number of French banks. The group changes over time. And then by the time we're in 2015, 2016, the period at issue, there is a Japanese bank that is part of the lender group. So when the loan is being made to the borrower, the agent collects the funds and disperses it. When the loan is being repaid, the agent collects the funds and disperses it. The idea that that's not part of the record in some way is actually belied by their very complaint, which talks about this role that the agent plays in dispersing to all of the lenders. Now, just to address a few of the points that were made. But let's get down to what his argument actually is. His argument, I take it, is something close to, but when Bank of America disperses the funds to the Japanese bank, it is actually dispersing the funds to a New York branch of the Japanese bank, which is in some way, shape, or form independent of Tokyo. So a few things. Number one, that's an argument that doesn't find any place in the notice of removal. Number two is, that's an argument that actually runs headlong, and I know this is personal jurisdiction type case law, but headlong into the cases like Gucci and Daimler, that basically say that when a foreign institution has a presence in the U.S., that alone is not enough for personal jurisdiction. So I recognize I'm reaching my analogy there, but I think there are a few points. It's also that Kirshner says alone, all you're looking to is whether the eject bank is transacting with a foreign entity. With a foreign entity. That's right. And so if it's transacting with a foreign entity on U.S. soil, it doesn't matter in your view. The point is that it's interacting with a foreign entity. It's not only my view, it's also the view of Kirshner, but yes. Well, yeah, I understand. That's what Kirshner did, you're saying. Correct. What Kirshner did was what it said is two of those 61 lenders were foreign entities. That is enough. And the concept of a direct assignment of a portion of the loan strikes me as not economically different than what's happening here in terms of being a part of a syndicate and getting the funds going back and forth with a foreign bank from the beginning without an assignment of something. I don't know how the mechanics of these transactions work, but at least you're suggesting whatever the mechanics, the point is the same that the Eject Bank, Bank of America, is dealing with a foreign entity. That's exactly right. And, of course, we're going to hear from your co-counsel about a situation in which the Eject Bank is not doing that. That's their problem. It is, but I want to point to one portion of 632, the Eject Statute, because what 632 says is that where you satisfy the three criteria, you have a civil action, you have an Eject Bank, and you have international or foreign banking and other pieces of that problem, but we're not talking about them, then any defendant may remove the suit. So it's not that we really have to talk about what his client's allegations are. Once my client satisfies the requirements of the EDGE Act, we remove the suit. It's not on a claim-by-claim basis. It's not on a descendant-by-descendant basis, but we're entitled to remove the suit. So based on that, is it your position that if this court were to find that there was federal jurisdiction based on the EDGE Act, we need not reach the Admiralty jurisdictional issue? Absolutely. Is that your position? Absolutely. There's no reason to reach the Admiralty piece of this. We removed on two grounds, and that's what their savings to suitor's clause argument gets you to. Is this Admiralty the sole ground for removal? Then that may not be proper. Whether that has vitality post-2011 is another story, but the circuit has... And the district court relied on the EDGE Act basis for federal jurisdiction, not Admiralty. That is correct. That is correct. And if there's a consensus of, say, a dozen banks, 11 of them are domestic banks, one of them is a foreign bank, that's good enough for removal? Indeed, and the point that the panel was making earlier with respect to are we setting a bar where we would have to create an evidentiary hearing at the outset of every case to determine the degree of foreignness, that's unworkable. And that's what Kirshner impliedly rejected. The arguments there were, this is not sufficiently foreign. Of those 61 lenders, there were only two, and they had $26 million of $1.775 billion of a loan. Those were the facts in Kirshner. And the answer was, no, we don't engage on the level of is that foreign enough. It's whether you are engaging, whether the EDGE Act bank is engaging with foreign entities. What do you think is the appropriate definition of foreignness? Well, I think I would say this. Number one is, Kirshner, I think, gets there after reviewing the statute, after reviewing the statutory purpose, and after reviewing the case law, including AIG, including CBS versus Ventura Bell, and comes to the conclusion that an EDGE Act engaging in core banking activity, we can talk about core banking activity later, but if you're engaging with a foreign entity, that is enough for international banking. What kind of engagement? Not any. So what you have in our case. A meet and greet meeting. Right, it has to be core banking activity, which I would, look, we can have, again, a debate about where the contours are, but extending loans, issuing letters of credit, taking deposits, those are core banking activities. What you have here is a loan, a revolver that was hundreds of millions of dollars. And so you don't really have a practical issue about whether the banking piece of this is satisfied. Really what we've been debating is whether the foreign or international piece of it has been satisfied. And you're saying it is whenever there is a foreign bank. It's rather simple to administer. If it's BNP, you got it. If it's someone from Switzerland, it doesn't matter at all. Once there's one foreign bank involved in the entire transaction, then there's EJAC jurisdiction. That's what Kirsten said, but also what CBS vs. Intero Sales from 1980 said. The language is a little less clear, but there is a New York-issued letter of credit, drawn out in New York, and that is on account of a Venezuelan corporation, and where to, that was the end of the inquiry. Could you just explain to me how this is at all consistent with the whole idea of the EJAC, which is that we need these nationally chartered banks in order to do certain kinds of transactions, and that's what makes them EJAC banks. This kind of transaction that we're talking about, it sounds like you don't need an EJAC bank for. Indeed, you didn't in the other loans that your colleague is going to talk about, because TPG, which is organizing this whole operation, I'm not even sure if they're a bank, but they're certainly not an EJAC bank. No one's contending they are. It's just that an EJAC bank is one of the members of the consortium. So, again, you're saying that doesn't really matter, but using that as an example, if that were the only consortium that were involved here, why would Congress want to make federal jurisdiction out of that case when they didn't need to make a national association in that situation? Sure. So, it goes back historically, right? The EJAC dates back to 1919, and the idea was at the time, the banks, which were more dispersed, less concentrated than they are today, there was a desire to have them be able to compete on a national site. So, yes, there's a portion that says these are the entities that can act entirely offshore, but there's the idea that you're freeing up U.S. banks from state and local regulations so that they can then compete with other foreign banks. So, in some ways, that's completely consistent with congressional intent, and if you look at what AIG really is talking about in terms of the policy, they're talking about providing a uniform, administrable, consistent federal forum so that the banks that are engaging and competing on an international field can come to federal court and have predictability in terms of the decision-making. So, essentially, foreign player core banking activities you can report? Correct. And the second circuit case you cited from 1980 is Corporacion Venezolana that's actually cited by the Kirshner Court in footnote 48 I was asking you a moment about. That's correct. Let me ask you, and I understand your position, which is your opponent's view that there has to be proof, in essence, that dollar-for-dollar phone contacts, travel cross-border, needs to be in the motion for removal in order for the court to find federal jurisdiction under the EDGE Act, and that your position is that's not necessary. But your opponent represented that there is nothing in the record. Now, he's saying we're limited to the motion for removal. Your position is this motion for removal was no different than the Kirshner motion for removal. But my question is this. Is he correct that there is nothing in the record to suggest that, in fact, there were cross-border activities? No, so the notice of removal also has attached to it the credit agreement. The credit agreement includes BNP Paribas and StopGen, which are two French banks. And then it also includes statements about Bank of Tokyo Mitsubishi, now MUFG, which is a foreign organized bank. And so all of those are part of the notice of removal. But, of course, part of the notice of removal can also be considered are their own pleadings, which say that Bank of Tokyo Mitsubishi was formed under Japanese law, and they allege that money was dispersed to Bank of America and flowed through to Bank of Tokyo Mitsubishi. They didn't say the New York branch of Bank of Tokyo? They did not say that it went to New York. They've argued that, of course, but they have not said that in their pleadings. Those are not their allegations. And if you look at the particular allegation at the front of their complaint, it's in the first 30 paragraphs or so, that talks about Bank of Tokyo. It says formed under Japanese law. What rule of civil procedure do you think informs what's required to be alleged in a notice of removal? That is an excellent question, to which I don't necessarily have a precise answer. What I would say is this. In many ways, what you are trying to do is something like a 12C motion, where you're giving the court two sets of pleadings on which to make a decision. So you have the complaint, and you have a notice of removal that includes the information sufficient to it. But with apologies, I'm not sure I can directly answer your question. If I may briefly turn to the pleading sufficiencies. Let me ask one question. I'm very curious about your position. One would have to be alleged or shown under the fraudulent conveyance theories for someone who is alleging to have been victimized by fraudulent conveyance to get money back out of your bank that was repaid for a loan that was extended in the ordinary course of business. And the repayment was unquestionably due to you. What would that look like? Let me start at a high level, and then I'll get to the very granular. At the high level, what the district court said was, which is quite clear in, frankly, every single case that Eddie Stone cites also includes those standards. What it means is a practical matter, especially when you have a subsequent transfer. And just in case it's held, BTS, which is their contractual account authority, is at the very bottom of this corporate structure. That you have virtual logistics. You have some intermediate subsidiaries there. And then their ultimate parent is a company called Serogas. Their ultimate parent is our borrower. Right. And so what you would need to allege, among other things, is, for example, the bank wasn't getting repaid on this ordinary course schedule. What they have here is their payments go into the banks at the end of the month. Well, previously, there weren't. Or the amounts changed. Or that the lender demanded that they get repaid at a certain collateral. What you have to do, and what you have to show, under all of the applicable case laws consistent with the plausibility standard, is that the funds go from the initial fraudulent transfer all the way up the chain and then over to the banks, which they have not done. How would you look at that? I mean, money is functional. Well, I think a couple of things. Number one is, if you had a borrower who was not like Serogas, with $2 billion of revenue, but you had a more thinly capitalized borrower, you might be able to show that there was no other way that they could have paid. Number two is, again, sometimes you're talking about the disposition of a specific asset. Right? There's a disposition of a specific asset, and that slowed up. Or it could be, again, a difference in amounts. You're paying your lenders $100,000 each month, and then suddenly you start paying them $10 million each month, or $100 million each month. That's not what is alleged here, and that's not what you have. And part of the reason to have a pleading standard that is plausibility and not something lower than that is because, again, the banks are many steps removed from these alleged initial transfers. And so if you want to be able to plead and to do it in a way that it makes sense to keep subsequent transfers in the case, you have to be able to show that. In this case, and you asked for time for sufficiency, I want to be fair and give you as much over time as your opponent got 19 minutes. You're about at nine minutes. So we'll let you argue the sufficiency. But to that end, and as a follow-up to the questions by Judge Parker, I get how the judge decided on the first motion to dismiss that there wasn't enough. Can you address the denial of the motion to amend and whether those allegations were sufficient? Because it seems to me there, once the protective order, because there's this direct lawsuit against feral gas which has now stayed, is it stayed because of this litigation or just stayed? It's not stayed. The Eastern District of Pennsylvania litigation, which is the one that's a direct litigation against feral gas, actually went to trial. So it was tried in 2018. Oh, you haven't judged it. We don't have a judgment yet. There's a bench trial, and was it fully submitted in August, and now it's still waiting for the shoe to drop? That's right. Okay. With respect to Judge Kahn's question, could you focus in particular on Exhibit F to the proposed amended complaint? Absolutely. It seems to show, I mean, I understand where these numbers come from, is that money is going from feral gas to the lenders on some sort of regular basis, right? So that's just scheduled. I don't know exactly what's happening there. But if what we're looking for is traceability, something that's going to be very difficult to prove at the end of the day, we're asking at this stage just whether it's plausible, whether it's not just a fantasy that who knows, maybe it's true, but there's something here. What I see is now that they were liberated to use the documents from Pennsylvania, they're showing a regular sequence of transfers from bridge logistics to feral gas that then are happening on more or less the same schedule and are such that all of that money could be used for paying off the lenders. Why doesn't that make it at least plausible that if they really dug into the details, they'd have traceability? Yeah. So a few points. Number one is the threshold point that has been made, that these were modeled after the Madoff pleading, and as a result that should be enough. And to get to the point that we're all talking about, Madoff was a funding scheme. There were no legitimate funds within the Madoff funding scheme. What we have here is a $2 billion enterprise with revenue coming in all the time. That's obviously omitted from Exhibit S. And so the fact that there are payments of $5 million or $3 million or $10 million going to a bank in the context of $2 billion of revenue doesn't lead you to the conclusion that that is plausible. It may be possible, probably quite speculative, but it doesn't reach that plausibility level when you have $2 billion of revenue at that enterprise. Yeah, so why does the $2 billion company have to strip all the assets out of the one entity that is the counterparty here? What do they need that money for? Obviously those are allegations. I'm not a party to the other allegations. I understand what you're saying, but those are the allegations. They are part of the allegations in this complaint. And you're not here to defend Ferrel Gas. I get that. But you're relying on the fact that they're this company that is sort of above the need to steal money from another pocket in order to pay their bankers. I guess that's the argument. And I'm saying, yeah, but they kind of did. And so, you know, to just say they didn't need to do this doesn't seem to me to really be an answer. Yeah, so a couple of things. Number one, there are all sorts of reasons why companies do internal restructuring. So they've obviously pled it as Ferrel Gas is taking from their subsidiary. That's not a finding. It's not a legal conclusion. There's some judgment in the Eastern District. Well, we're going to hear that. I mean, should we just wait and see? Maybe the whole case disappears if Ferrel Gas winds up satisfying them as a result of the Pennsylvania case. Well, that never happens, right? Because even if there's a judgment against them, they'll appeal for another 10 years to the Supreme Court and it'll just keep going on and on forever. So just a thought on that, which is, we think there's obviously a basis to affirm on the lack of a pleading of a subsequent transfer. In other words, you need the entire chain up from the bottom over to us. We don't think they have the entire chain anywhere. Number two is, you're right. I mean, Eddystone is trying to recover that same judgment from lots of folks all over the country at this point. Yeah, it's not understandable they would because they got screwed. I mean, their complaint is pretty persuasive. As a complaint, I mean, it was just been litigated. It may turn out not to be true. That's right, but there is also the impact, as they are a contractual counterparty to a subsidiary. They have no contractual relationship with us. And so what they're trying to do is really go through a number of steps to get to the banks that they believe have deeper pockets. I think a question I have that I didn't get to ask is this. The court denied their motion to amend the complaint. Even assuming the complaint was sufficient, the amended complaint, to satisfy the requirements for allegations, the plausibility requirement. The court also said it's too late and prejudicial. With the couple of minutes you have left, do you want to address that? I would like to, because I actually think the protective order argument is a little bit of a red herring. What the district court had before it was clear information, clear information in the records, that what Eddystone did was it had 2.8 million, excuse me, 2.8 billion pages of discovery in front of it. As of the time they pleaded these claims against our client. The initial complaint. At the time they pleaded the initial complaint. The initial complaint is 2019. They had 2.8 billion pages as of 2018. So they had it. They were sitting on it. Again, that is the plaintiff, that is the litigant. And they could have also heard the protective order to be modified sooner. They could have, but the protective order really is only an issue about whether they can provide it to their counsel and whether they can quote-unquote use it. It doesn't stop them from discharging their rule 11 burden, which is to conduct an inquiry reasonable under the circumstances as to whether these facts are borne out or not. And the rail car allegations that they've now stripped out, so that was the core of the original complaint, is that there were 1,000 rail cars that were sold and the proceeds went to us somehow. And that was concluded to be insufficient. They then went back. They looked at these documents they've been sitting on since 2008. They withdrew those allegations because they concluded the rail cars never actually were with BTF, the contractual counterparty. And so when we go back to what is the prejudice, it's a couple of things. Number one is they opted to sit on this information and either not examine it or actually know that the allegations were insufficient and waive party and judicial resources through that period of time. The other piece of it is, again, when you talk about leave to amend, it's often to allow a party to be able to introduce information that is overlooked or unknown at the time. We just don't have it. They were sitting on every single one of these documents for the entire three years that we're talking about. And so it was not error, and again, we're talking about a new use of discretion here, it was not error for the district court to conclude that what we're talking about is pleading allegations that were wrong at the outset, that they were trying to start over with a thin pleading based on information, again, that they had had from the outset, and that for all of those reasons, it was appropriate to conclude that there was prejudice as well. Unless there are questions, thank you very much. Thank you. Counsel, I believe you have four minutes. Judging how things are going. You have six. Thank you. Robert Ward, on behalf of the last four defendants in the case, we call them the 28 defendants, and I rely upon Ms. Samet's arguments in particular about the EDGE Act, but Judge Winston, in response to your question, first off, I agree with her statement that you remove actions, you don't remove claims. So I don't think it's a relevant question. However, you have raised it, and let me say this. The plaintiff decided to sue Bank of America and us. They joined us together. So if as a result of the fact that perhaps Bank of America has a stronger EDGE Act subject jurisdiction claim, that's the way it goes because plaintiffs decided to sue us together. The difference, I think, between Bank of America and us is that Bank of America is the agent bank, and it's a national bank. TPG is the agent bank. But PNC, which is part of our syndicate, which is a signatory to the credit agreement, that's the EDGE Act bank. But POTUS is the foreign bank, and they're signatory to the same credit agreement. Money is coming in. The money, I think, Judge Parker, you were saying, is fungible. Money is coming in. Money is going out. It's going from you. It's coming back. At least that's the allegation that we make in our papers. But since I only have four minutes or perhaps six, I don't want to get too bogged down, because I think it may just be an academic question because plaintiffs sued us together with the NIH. Yeah, I got it. I understand that point. I just wanted to answer your question. Thank you. But the one thing I did want to get into quickly is antecedent debt. At issue here is the payment of antecedent debt and the Sharpe case and the HPE leasing case of this court as well as the Ultramar case and the Sardis case of the appellate division in New York law applies here, says that the payment of antecedent debt is a dispositive defense through a fraudulent convenience action. Regardless of the subsequent transferee's knowledge, we're the subsequent transferee as an outsider. That is, we're an outsider, clearly. We're not the debtor's shareholder, officer, or director.  The New York law is direct on that point. Now, typically, the defense of antecedent debt, when you're not involved with an outsider, requires both fair consideration, but the payment of antecedent debt is fair consideration, but it also requires good faith. It also requires good faith, which often gets into your lack of knowledge or knowledge. However, as Sharpe makes very clear, HPE leasing, both of this court make clear, the Ultramar case and the Sardis case, when you have an outsider, the subsequent transferee's knowledge is irrelevant. So we think that's a dispositive matter here. Now, even if knowledge is relevant, the fact is we say that there's a pleading deficiency. Most of the pleading of knowledge, so to speak, by the plaintiff here is upon information and belief, and we've cited the cases that pleading on information and belief is not adequate to plead knowledge. Some of the pleading of knowledge is that we have notice. We go through our brief as to why we don't have notice. I don't really have time to get into that. However, the case law also shows that notice is not knowledge. So even if pleading knowledge was necessary, in other words, Your Honor, typically you have to plead fair consideration, but the payment of antecedent debt is fair consideration. That's clear under the law. There's no doubt about that. And you have to plead good faith, but that's only when you're an insider. We have an outsider here, both B of A and their group, and our group, we're outsiders. We're not shareholders, directors, officers. So we believe that that's dispositive. In addition, I'd like to talk about... On the fraudulent conveyance matter. Pardon me? On the fraudulent conveyance matter. On the fraudulent conveyance matter, which is... I mean, there's only two causes of action here, and they're both fraudulent conveyance, so that's dispositive in terms of, you know, as far as we're concerned. And plaintiff says that we shouldn't have raised that on a motion to dismiss. I assume what plaintiff is saying is that there's a factual issue there, and therefore it's not right for a motion to dismiss because of the issue of knowledge. But since we're an outsider, the case law, this court, the appellate division is clear. The outsider's knowledge is irrelevant, so there's no factual issue. These are all legal issues. It was antecedent debt. We're an outsider. There's no issue. It's a matter of law. The case should be dismissed. I want to raise something about Swan Ranch, which is more particular to us, but Eddystone needs to focus on Swan Ranch because that's the only asset it alleged was transferred by BTS in connection with the claim against us. But in paragraph 56C of the original complaint, the allegation is that Swan Ranch was transferred by BTS to Bridger Swan Ranch. But in paragraph 78, the allegation is that two years later, Bridger Terminals, not Bridger Swan Ranch, sold the asset and paid us. There's no allegation in the complaint about how the asset was transferred. It's kind of a little like quantum mechanics. It goes in, it comes out, it disappears, comes out the other side. There's no pleading. We can't tell how one went to the other. In addition, at paragraph 78, this is the original complaint, there's an allegation that Bridger Terminal LLC sold off, quote, the remaining assets, including Swan Ranch. So Bridger is selling off assets, including Swan Ranch, but including other assets. Now, plaintiff can only trace Swan Ranch back to BTS, but they plead in paragraph 78 of the original complaint that the assets that were sold to pay us included Swan Ranch, so obviously they included other assets. There's no way to tell from the pleadings, and therefore they're insufficient, as to whether or not the proceeds of Swan Ranch were used to pay us. Some of them were used to pay us. None of them were used to pay us. You can't tell. Now, the plaintiff says that they corrected that in their proposed amended complaint, but they didn't. Because at paragraph 61, once again, they talk again about BTS transferring Swan Ranch to Bridger Swan Ranch. But at paragraph 94, they say the transfer was by BTS to Bridger Terminals and Bridger Swan Ranch, with no particularity to which one. In addition, at paragraph 94, they say that there were terminals, plural, multiple terminals, sold by Bridger in 2018, not just Swan Ranch. So once again, if Bridger Terminals is upstreaming the money to FGP and FGP is paying us, we have no way of knowing from the pleadings whether the terminals that led to the proceeds that went up the chain were Swan Ranch, which is the only one they can trace back to BTS, or whether it has something to do with other assets. In addition, at paragraph 94, they also say that what Bridger Terminals sold in 2018 included Swan Ranch. So once again, there are other assets that could have gone to pass that aren't traceable back to BTS, so we can't have been the subsequent transferee. So, in fact, the pleadings by the proposed pleading and the original pleading isn't clear as to whether we were not paid by assets. I know there's a number of double, maybe triple negatives here. But there's nothing in the pleading that indicates whether or not we were paid by assets other than Swan Ranch. In addition, there's nothing in the pleadings from which we can tell that we didn't get paid by the regular operating revenue of FGP, which is an operating company and which is alleged by plaintiff to be the entity that paid us directly. So we don't know where the funds are coming from. How could you possibly, falsely make any of these with the missing allegations without some discovery? I mean, who doesn't have access to the books and records and so forth? Well, actually, Your Honor, they're the plaintiffs in a case in the Eastern District of Pennsylvania where they allege, or we know from the back and forth we had, that they were produced over a million documents in the Eastern District of Pennsylvania case. So that may be a good point, Your Honor. In some other cases, I could address that. But the fact is, I don't think it's a good point here. The same plaintiff had access to discovery in a case that started well before us that had over a million documents produced. In fact, in that case, I believe there was the fraud exception to the attorney-client privilege rule was waived, so they had access even to attorney-client privilege documents. So your argument is the same, in essence, as your co-counsel. Her point is, the amended complaint may contain more information, but they have this all along. They could have alleged it sooner. Your point is, they have all this information. They still haven't alleged enough. And they still haven't. Their proposed amended complaint got into a few more details, but didn't address some of the major problems that Judge Danes had. I just want to address two more things. Counsel, I just want to note for the record, you're now at almost six minutes over your time. So ten minutes, if you can briefly address them. I can do it. Please do. I don't mean to cut you off, but I am trying to keep things moving along. Two more concepts, and that is, Your Honor, there was a 30-month gap between the BTS transfer, as alleged, from BTS to Omara Swan Ranch, which is not clear. That 30-month issue raises issues as to the plausibility of the claims. A lot could have happened in that 30 months. And, again, it's a plausibility standard. So in addition to the allegations and the pleadings, which significantly undercut the plausibility of the claim, there's this 30-month gap, which is never explained. And that really, I think, undercuts the plausibility of the claim. The final point I would make is that the plaintiffs allege that when Swan Ranch, the only asset traceable back to BTS, was sold, it was valued at $18.5 to $20 million. However, the allegation is that Bridger, through FGP, transferred $32.8 million to us. And those numbers don't match up at all. And, once again, I think undercutting the plausibility of the claim. So we don't think they met the plausibility standard, Your Honor. Thank you. Thank you, counsel. Now, Attorney Tabak. Did I pronounce that correctly? Tabak. You have three minutes, and we're going to hold you to it, okay? Well, I appreciate the opportunity to respond to a lot of these new things. Yes, you may. There was, for the first time ever, an allegation of a Rule 11 violation. That's their prejudice about the rail cars. Never raised it below. Didn't raise it in their briefs. It really tells you the desperation that they are to find some prejudice. Didn't the trial court find that it would be prejudicial to allow the amendment? The trial court said it would be prejudicial, but it did not identify any prejudice. Because the only prejudice was that they had already briefed a motion to dismiss. This court, in Pasternak and other cases, has repeatedly said it's an abusive discretion to say that just because they had to brief a prior motion, that that is prejudice. Well, that's not fair. I mean, Judge Daniels said it a little more. He talked about the length of time and the access you had to materials that you now wanted to put in. So, you have to explain to us why you think his decision was an abusive discretion. Sure, sure. There was no prejudice. Period. The length of time does not create prejudice. This court's precedent say that. The fact that they had to make a previous motion is not prejudice. Prejudice has to be some sort of loss of evidence. Usually, it's very late in the game. Discovery is already concluded. Here, discovery hasn't begun. I thought you had access to millions of documents. And by court order in the Eastern District of Pennsylvania, we could not use them here. But why couldn't that motion to lift that barrier have been made earlier? So, I'll give you two reasons. But first, as a matter of law, we didn't need to. As this court has repeatedly said, the time to amend the complaint is after... After you've had the opportunity to be told by the court what you need and what is lacking. So, your position basically is, this is just like any other case where there was a complaint, there was a motion to dismiss the complaint that was successful, then you ask for leave to amend. And it took a lot of time because this is a very complex case, but that's not a problem, really. They have to point to some actual prejudice other than we went through a motion to dismiss, which it was your right to stand on your complaint until you were told it was bad by the district court, and then it's time for you to react. And that's when you went and got permission to use more information to fill the gaps. That's absolutely right, and I'll move now to the TPG defendants who said our allegation was only about Bridger, the Swan Ranch terminal. That's completely incorrect. Paragraph 61C of our amended complaint, page 939 of the record, the amended complaint talks about Swan Ranch and the other terminals, and then it says that they were all sold. And according to an SEC filing, proceeds from that sale went to the TPG lenders. I don't understand how it can be implausible if it was in an SEC filing that proceeds went. Then they say, well, the numbers don't match up. That's not what the law is. The law doesn't say that you have to show every single dollar. It just says that they acknowledge it's in a footnote, and some of that money plausibly went to them. That's very clearly the case that it's in an SEC filing. Why did you wait three years and seven months to file an amended complaint? Now, when your client had the documentation, it could have filed a complaint that was just like the amended complaint, and the district court, Judge Daniels, on page 10 of the opinion says that in the analysis of the undue delay in prejudice, that waiting three years and seven months to make allegations when you have the documents in your possession is prejudicial to the other side. Why wait three years? As Judge Lynch very clearly explained, because we didn't know what we would need to plead again, and we were barred by court order from using it in the initial complaint. Barred by court order. You moved for a protective order. You could have moved three years earlier. Well, we couldn't move before we filed the complaint here, because as Judge Gorenstein said, we needed a protective order in this case to say to the judge in Pennsylvania, if you allow us to use the documents, there's another order that means that they're still protected. So we asked the defendants here to agree to have a protective order. They refused. And you couldn't ask the court for relief? You could have said, Your Honor, we want to amend the complaint even before your decision on the motion to dismiss. Right? You could have sought to amend it, and mooted out the motion to dismiss and asked for a protective order. That gets exactly to what Judge Lynch says. The rule in the circuit very clearly is until the first motion to dismiss is decided, you don't need to know how you're going to do it. Well, you don't need to. It doesn't mean you can't. What's in these documents down in Pennsylvania that needs such great protection? There are all sorts of internal records for the companies. That's really, I think, more for the defendants there. That's a decision of the court in Pennsylvania. That's not something that we could control. You didn't ask for any of these things to be sealed. They're the ones who asked for it to be sealed, not them. The defendants in the Pennsylvania case are the ones that wanted that protective order, and they got it. Exactly. And when we went to Pennsylvania to try to amend, they opposed. And that was part of the delay here. The other part of the delay is, frankly, the motion for the remand was pending for a long time. The motion to dismiss was pending for a long time. Part of the delay between the three years to the seven months. Not part of the delay. You didn't seek to amend the protective order until after this case was initially dismissed, correct? No. That's even more than you didn't seek to amend your complaint. Because now we had to involve another court in the pleading here without even knowing what amendments we may or may not need. So what's your response to Mr. Ward's contention that you can't get to his clients because of an antecedent debt and outsiders? So that really comes from Ultramar. It only applies, in essence, where there's what, in bankruptcy law, we would call a preference. In cases where there's a preference, the Uniform Fraudulent Conveyance Law doesn't address it. The DCL, the old DCL. And here, we do have, as Judge Lipsett said, we've got an initial fraudulent conveyance that made it past summary judgment, made it to a trial. So there is an initial fraudulent conveyance alleged. We're not in the world of Ultramar at all. But now it's gone. It's the next step up the chain, right? But Ultramar only applies, first, to the initial transfer. And second, it only applies to constructive fraudulent conveyances. And we cited a couple of cases. I think HPE was one of them, from this work, that says, yeah, I may be wrong. But there are a few cases that say it only applies to a constructive fraudulent conveyance. It does not apply where you have an actual fraudulent conveyance. What I think the other point on their 278 argument is they're trying to collapse four things into one. Section 278 is a defense, where there is fair consideration and lack of knowledge of the fraud. Which, by the way, is constructive knowledge. Very clear in the cases. And defendants, by the way, can really put it. You're confusing me. Yeah. But I'm confused. OK. Sure. So his clients say, he says on behalf of his clients, today he's seeking debt. And they're outsiders. Why is he wrong? What is your response to his contention that you can't recover under your fraudulent conveyance against him? So he's collapsing four elements into one and saying that as long as it's an antecedent debt, it covers all four elements of 278 and 272. So 278. Can you just help me? I mean, I'm not a bankruptcy lawyer. Sure. I'd like to go through the elements, if that helps. Now, if you can answer the question without, you may not be able to, but just without having to parse the code sections. I mean, so there are answers that you can go through the code sections and show that the payment of an antecedent debt is one of two ways of showing fair consideration. And their argument is, if you show consideration, excuse me, for payment of an antecedent debt, rather than providing value in return, it covers not just the payment. It also covers that it was essentially fair value, which is probably correct. It also covers the fee, which it doesn't really cover. And it covers without knowledge of the fraud. There's no case that says that receiving payment on an antecedent debt covers every element of the affirmative defense. Also, the affirmative defense doesn't apply. The antecedent debt argument doesn't apply when there's an actual fraudulent conveyance. And it also applies only where the first transfer was a preference of paying one creditor instead of another, instead of a fraudulent conveyance. Here, we've alleged fraudulent conveyances. Thank you, counsel. Unless there are further questions from my colleagues, you're now seven minutes over your rebuttal time.